IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUAN COBBIN | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES CAPITOL POLICE | ) |
| | ) |
| Defendant | ) |

**COMPLAINT**

Plaintiff, Sergeant Juan Cobbin (retired), brings this civil action against Defendant, United States Capitol Police (USCP) because of racial discrimination and retaliation against him.

Defendant has a systemic problem with discrimination within its K9 Unit.  Rather than correct that problem by removing officers who harbor discriminatory animus, Defendant protects those officers and punishes the victims.  In this case, that meant Defendant rejected Sgt. Cobbin, who is African American, as the Head of the K9 Training, shortly after he had lodged a complaint about racial discrimination in the K9 Unit.

Sgt. Cobbin has held the position of Head of K9 Training (or Acting Head of K9 Training) on and off between August 2013 and May of 2021.  Indeed, Sgt. Cobbin was the first African American Head of K9 Training at USCP, and he has been moved in and out of the position at various times when Defendant wanted to place unqualified white individuals into the role. Each time, Defendant has had to bring Sgt. Cobbin back to train those individuals or to help the K9 Training Unit to recover due to their mismanagement. Nevertheless, in October 2021, Defendant removed Sgt. Cobbin from consideration for the Head of K9 Training, claiming that he lacked the minimum qualifications for the position.  The truth is that Sgt. Cobbin was removed from

consideration because he is African American, and he had complained about discrimination in the K9 Unit.

## JURISDICTION

1.     Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995, as amended (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2.     This is an action authorized and instituted pursuant to the Congressional Accountability Act, as amended (2 U.S.C. § 1301 *et seq*.).

3.     The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4.     Plaintiff is a former employee of the USCP and is therefore an "Covered Employee" covered by the Congressional Accountability Act, as amended (2 U.S.C. § 1301(3)(D)).

5.     Defendant USCP is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6.     Defendant is headquartered in the District of Columbia.

7.     The Congressional Accountability Act makes it unlawful for USCP to discriminate against employees based on, *inter alia*, their race.

8.     The Act also makes it unlawful for the USCP to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act."

9.     Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely complaint at the Office of Congressional Workplace Rights, which included all claims made in this civil action, on November

17, 2021.  Plaintiff files this suit within the time limits defined by the Act (*i.e.*, within 70 days of filing his OCWR complaint), and Plaintiff has not requested a hearing before the Office of Congressional Workplace Rights.

## FACTS

### *Sergeant Cobbin's History as Head of K9 Training*

10.   Sergeant Cobbin is an African American man who began as a Private with the U.S. Capitol Police in 2002.

11.   Sgt. Cobbin became the first African American Sergeant in the K9 Unit in 2009, and in August 2013, he became the first African American Head of K9 Training, a position he held on and off until May 2021.

12.   As Head of K9 Training, among other things, Sergeant Cobbin oversaw the USCP's program for training its own officers, and their K9 partners, to perform explosive detection work.

13.   Sgt. Cobbin is exceptionally well qualified for the Head of K9 Training, because of the numerous K9 training certifications he holds, the trainings he has attended, and his years of experience as the Head of K9 Training.

14.   Among Plaintiff's certifications, he holds several explosive handling and safety certifications, but more importantly, he is a Certified K9 Detector Trainer (U.S. Police Canine Association) and K9 Evaluator (AKC Canine College).

### *A History of Discriminatory Action in the K9 Unit*

15.   A discriminatory environment has pervaded USCP's K9 Unit for years.

16.   Robert Spruill (now deceased) was an African American Sergeant with the Capitol Police, who Plaintiff met when he began on the force.

17.   Before he was promoted to Sergeant, Spruill was one of very few African American K9 Technicians (USCP officers who are specially trained as K9 handlers are known as K9 Technicians), and he had to deal with the racist attitudes and conduct of several white supervisors and officers in the K9 Unit.

18.   In 2004 or 2005, Sgt. Spruill gave Plaintiff a hand-written statement about the treatment he had endured at the hands of certain of his white colleagues in the K9 Unit. That statement is included as Exhibit 1.

19.   On one occasion, which occurred during his interview for a K9 handler position, a Lieutenant in the Special Operations Division asked Spruill what he would do if the Sergeant called him a "nigger" while they were in the field training.

20.   On another occasion, one of Officer Spruill's colleagues told him that he would never live next to anyone who was African American.

21.   In another instance, the same Lieutenant mentioned above was speaking with a K9 Technician who had just finished a sweep of a dinner for the Congressional Black Caucus. The Lieutenant asked – within Spruill's hearing – if the Congressional Black Caucus had been served chicken and collard greens for dinner.

22.   When Spruill complained to a Commander on the patrol division, the Commander, who was also African American, told him: "sometimes you have to put up with this shit. I've been doing that for years – these white boys don't change."

23.   For his part, when Plaintiff was on the 55-officer strong K9 Unit, Sgt. Cobbin was only 1 of 6 African American officers.

24.     When Sgt. Cobbin first arrived in the K9 Unit in 2009, he was told by a veteran K9
        Technician that some of the dogs had recently been re-named because the former names
        were racist.

25.     Sgt. Cobbin faced resistance from many white officers, even before he began his tenure
        as Head of K9 Training.  In 2013, a group of white K9 Technicians, led Garrett Zborai,
        circulated a petition that was aimed at depriving Sgt. Cobbin of the Head of Training
        position.  Instead, the white officers wanted a white Sergeant, Anthony Phelps, to have
        the position, even though Phelps had never been a K9 trainer, and he lacked the training
        and certifications that Sgt. Cobbin held.

26.     Further demonstrating the systemic race problem in the K9 Unit, are social media posts
        over the years by K9 Technician Andy Maybo.  These are attached as Exhibit 2.

27.     In 2015, following the City of Baltimore's decision to settle with the family of Freddie
        Gray, whose death in the spring of 2015 set off weeks of protests and rioting in
        Baltimore, Maybo's posts berated the city for settling with Gray's family, referring to
        Freddie Gray as a "POS" [Piece of Shit] and calling for the Mayor of Baltimore (then
        Stephanie Rawlings-Blake), who is African American, to be "placed in jail with the
        animals who placed all these officers in danger."

28.     In 2016, Maybo posted about an incident, in which an officer was shot, and a suspect
        killed, following a traffic stop in Chester, Pennsylvania.  Referring to the African
        American crowd that had gathered after the event, Maybo posted "as for the unruly
        crowds … I hope more of those mutts get shot!"

29.     It bears noting that Maybo was no mere rank-and-file officer.  He was formerly the
        President of the Capitol Police Union.  His racist posts are accompanied by an image

of him in his Capitol Police uniform, posing with his K9 partner dog.  These posts were widely circulated within Capitol Police and made it to Sergeant Cobbin's attention.

30.     Officer Maybo, on information and belief, remains in his position with USCP as a K9 Technician.

31.     In 2020, Lieutenant Robert Rohm (white) replaced Lt. Stewart Cromwell (African American) as the Lieutenant over the K9 Unit.

32.     One of the Administrative staff in the K9 Unit wrote to several officials, complaining that although the administrative staffer and Sgt. Cobbin (both of whom are African American) were the appropriate and natural sources of information for Lt. Rohm to familiarize himself with the K9 Training program, Lt. Rohm regularly avoided Cobbin and the Administrative staffer, and instead, he asked his questions of the white officers in the Unit.

33.     On information and belief, no action was taken because of this complaint.

34.     More recently, another K9 Technician - Michael Riley - has made the news for being indicted for allegedly informing a suspected January 6, 2021 rioter that Riley agreed with his views, and the suspect should destroy all online posts and other evidence of his participation in the insurrection.

35.     All this is to show that bigotry and bias have been a part of the K9 Unit for years, and it has not been addressed.  Instead, Defendant rewards and emboldens the bigotry evident on the force by removing African American leaders, like Plaintiff, from the K9 Unit.

### *A History of Transferring Sgt. Cobbin in and out as the Head of K9 Training*

36.     In January of 2016, then Inspector Belknap and then Captain Erickson informed Sgt. Cobbin that he was being replaced as Head of K9 Training by Sgt. Anthony Phelps (the white Sergeant supported by K9 Tech. Zborai's petition in 2013), in a non-competitive action and with no valid reason given.

37.     Sgt. Cobbin initiated a complaint at the Office of Compliance (as the Office of Congressional Workplace Rights was then known), but due to financial duress he was unable to see that case through to file a civil action.

38.     Because Sgt. Phelps was unqualified for the position, Plaintiff had to be detailed back to the K9 Training division, beginning in June 2016, to try to teach Sgt. Phelps how to run a K9 Training program.

39.     Sgt. Phelps was removed as Head of K9 Training in early 2018, following the filing of a discrimination and retaliation lawsuit against the Defendant (*Van Meter v. U.S. Capitol Police*, U.S. District Court for the District of Columbia Case No. 18-476, which remains pending).

40.     After Phelps was removed, in early 2018, Sgt. Cobbin was again detailed to Act as Head of K9 Training, but shortly thereafter, the position was made into a civilian position and filled with another unqualified person (who was not African American), who lacked the required training credentials.

41.     The civilian was terminated because he lacked the qualifications necessary to be Head of the K9 Training program, and again, Sgt. Cobbin was brought back as Head of K9 Training, in an acting role, between 2019 and May of 2021.

*__Sergeant Cobbin's Recent Protected Activity__*

42.  Relative to this case, trouble started for Sgt. Cobbin again in the summer of 2020, when a white K9 Technician, Christopher Baranowsky, objected to a decision made by Sgt. Cobbin and other African American leaders within the Special Operations Division, to have K9 officers leave their dogs at the training facility kennels when the officers were tasked with non-K9 duties.  These non-K9 duties included providing additional manpower for larger demonstrations.

43.  Even though USCP K9 dogs are only trained for explosive detection work and are not trained for use in crowd control situations, Baranowsky wanted the K9 officers to have their dogs with them at all times – even when the officers were assigned to perform non-K9 assignments related to large demonstrations.

44.  The first time this became an issue was when Baranowsky wanted the K9 Technicians to have their dogs with them when they were assigned to work those non-K9 duties during Black Lives Matter and related demonstrations in the summer of 2020.

45.  Not only would the presence of K9s have created a serious danger to the public, K9s, and officers, it also would have further aggravated racial tensions following the death of George Floyd and created a public relations nightmare for the USCP, harkening back to the horrific use of police dogs to attack African American civil rights demonstrators in the 1960's.

46.  Sgt. Cobbin and others who were in the chain of command at that time disagreed with Baranowsky's position, and they explained the dangers and the appearance of discriminatory policing tactics.

47.    Baranowsky railed against the decision not to allow the K9 officers to have their dogs with them during these demonstrations, and he made his view known up the chain of command.

48.    In a January 11, 2021 email that he sent to each K9 Technician in the Unit, Baranowsky recounted recent conversations and meetings he had with the leaders of the Special Operations Division, to express his discontent with their decisionmaking.  That email is attached here as Exhibit 3.

49.    According to Baranowsky's mass email, during a January 2021 meeting, Baranowsky told (then) Captain Denea Newell and (then) Lieutenant Eric Graves, both of whom are African American, that they were both "incompetent" and that it was a "failure of our department" to even have them in the K9 chain of command.  In the same meeting, Baranowsky denounced Sgt. Cobbin as "a joke" to whom Newell and Graves should not listen.

50.    Baranowsky's opprobrium was not limited to the decision refusing to allow the K9 officers to have their dogs during large demonstrations.  In addition, he insisted that Acting Chief Yogananda Pittman (African American) should exercise her power to immediately order all USCP markings to be removed from the K9 officers' work vehicles.

51.    Baranowsky exaggerated approximately three instances, in which there was minor vandalism on or near K9 vehicles parked at officers' homes, into something akin to the fabricated "Black Menace" of Jim Crow days.  Baranowsky claimed, based on those few instances of minor vandalism, that Black Lives Matter supporters in this region

were "out for LE [law enforcement] blood" and posed a threat to the officers and their families.

52.    Baranowsky also declared that Newell, Graves and Cobbin must all "be held accountable" for their refusal to allow the officers to keep their dogs with them during demonstrations and their disagreement over removing all markings from the K9 work vehicles.

53.    Baranowsky's email, recounting his efforts to discredit the African American leadership, drew the support of two K9 Technicians in particular, Garrett Zborai –who had spearheaded the petition to keep Sgt. Cobbin out of the Head of K9 Training position in 2013 – and Christopher Skomra.

54.    Skomra's contribution to the email dialogue was a diatribe complaining that, while USCP officers were being investigated for supporting and abetting January 6 rioters, there had been no investigation when USCP officers had knelt in acknowledgment of a peaceful Black Lives Matter protest at the Capitol.  In other words, Skomra believed that officers who knelt for Black Lives Matter protestors should be treated the same way as the officers who supported and/or aided the January 6 insurrectionists who stormed the Capitol to block the certification of the presidential election.

55.    On or about January 11, 2021, Sgt. Cobbin complained to his first- and second-line supervisors, Lt. Robert Rohm and Captain Denea Newell about these racist emails.

56.    Sgt. Cobbin, and possibly others, forwarded the racist emails to the Office of Professional Responsibility, the Unit within USCP that is responsible for investigating claims of discrimination, which was headed by Michael Shaeffer at the time.

57.    In March 2021, Sgt. Cobbin gave an interview to the Office of Professional

Responsibility about the emails.

58.     Rather than confront and address the problem of systemic racism among the ranks of
        the K9 Unit, Defendant took the opposite approach.  On or about April 30, 2021, shortly
        after Sgt. Cobbin complained to Rohm and Newell about the emails, and immediately
        after Sgt. Cobbin met with the Office of Professional Responsibility, Sgt. Cobbin was
        inexplicably removed – not just as the Head of K9 Training – but from the K9 Unit
        entirely.

59.     Sgt. Cobbin was replaced with a white Sergeant as Acting Head of K9 Training. This
        white Sergeant was not a certified K9 detector dog trainer, which was a requirement
        for the Head of K9 Training.

60.     Sgt. Cobbin's removal from the K9 Unit was motivated either by discriminatory animus
        against Sgt. Cobbin, because he is African American, or out of a desire to assuage some
        of the K9 technicians' discriminatory animus.  In addition, or in the alternative, the
        decision was motivated by retaliatory animus toward Plaintiff because of his
        complaints about the racist emails and his complaint to the Office of Professional
        Responsibility.

61.     As a result of being removed from the K9 Unit, Sgt. Cobbin submitted his resignation
        papers, and his retirement became effective October 31, 2021.

### *The Discriminatory and Retaliatory Non-Selection at Issue in this Complaint*

62.     In May 2021, Sgt. Cobbin filed a complaint at the Office of Congressional Workplace
        Rights to contest his removal as Head of K9 Training, and that matter is currently
        pending at the OCWR.

63.     During discovery in Plaintiff's OCWR complaint, Defendant announced the opening

        for a permanent selection for the Head of K9 Training.

64.     Plaintiff timely applied for the position and submitted all required documentation.

65.     During the week of October 19, 2021 – only days after he took the depositions of high-

        level officers – Defendant advised Sgt. Cobbin that he was not being considered for the

        Head of K9 Training position because he (allegedly) did not meet the minimum

        qualifications for it.

66.     The USCP's statement is decidedly false, as Sgt. Cobbin is exceptionally qualified for

        the Head of K9 Training position.

67.     The position of Head of K9 Training remains open, and a selection is apparently

        pending.

## COUNT I: DISCRIMINATION BASED ON RACE

68.     Plaintiff repeats and incorporates each of the foregoing paragraphs as if they were

        specifically restated here.

69.     Defendant USCP violated the Congressional Accountability Act because it rejected

        him for the position of Head of K9 Training because Plaintiff is African American.

70.     Plaintiff was eligible and extremely well qualified for the Head of K9 Training position.

71.     Plaintiff timely applied for the Head of K9 Training position, and he submitted all

        requested documentation to demonstrate his qualifications and eligibility.

72.     On October 19, 2021, Plaintiff was removed from consideration for the Head of K9

        Training due to discriminatory and/or retaliatory animus, and the selection is

        proceeding.

73.     As a result of the USCP's unlawful conduct, Plaintiff has suffered substantial economic

damages, in the form of lost income.

74.  As a result of the USCP's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation.

## COUNT II: RETALIATION

75.  Plaintiff repeats and incorporates each of the foregoing paragraphs as if they were specifically restated here.

76.  Defendant USCP violated the Congressional Accountability Act because it rejected him for the position of Head of K9 Training in retaliation for Plaintiff's prior protected activity, including but not limited to his complaints about the racist emails as well as his complaint at the Office of Congressional Workplace Rights and his ongoing efforts to litigate that case, which remains pending.

77.  Plaintiff was eligible and extremely well qualified for Head of K9 Training Position.

78.  Plaintiff timely applied for the position and submitted all requested documentation to demonstrate his qualifications and eligibility.

79.  On October 19, 2021, Plaintiff was removed from consideration for the Head of K9 Training due to retaliatory animus, and the selection is proceeding.

80.  As a result of the USCP's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income.

81.  As a result of the USCP's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and

employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying him any monetary damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com

Attorney for the Plaintiff, Juan Cobbin